# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. LAVELLE MANGRUM

**Appeal from the Criminal Court for Shelby County**
**No. 1202097    Robert Carter, Jr., Judge**

---

**No. W2013-00853-CCA-R3-CD  - Filed July 28, 2014**

---

Lavelle Mangrum ("the Defendant") was convicted by a jury of second degree murder. Following a sentencing hearing, the trial court sentenced the Defendant to twenty-four years' incarceration. In this direct appeal, the Defendant contends that the evidence was insufficient to support his convictions, that the trial court erred in allowing testimony that the Defendant was gang affiliated, and that the trial court erred in allowing testimony that a witness was attacked shortly after giving a statement to police. Upon our thorough review of the record and applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Brad Eiseman and Eric Mogy, Memphis, Tennessee, for the appellant, Lavelle Mangrum.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Tracy Jones and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendant on one count of premeditated first degree murder. The Defendant proceeded to a jury trial on January 8, 2013.

Michael England, an officer with the Memphis Police Department ("MPD"), testified at trial that he was working as a patrol officer on the night of March 3, 2006, when he

responded to a call of "man-down" at the corner of Shaw Place and Jenette Place in Shelby County. When he arrived, another officer already was present on the scene. In a vacant lot adjacent to Shaw Place, Officer England saw "a male black laying in the weeds, his pants pulled down I believe somewhere between his knees and his ankles, laying face up, and appeared to be deceased." Officer England contacted paramedics and secured the scene while he waited for homicide investigators to arrive.

On cross-examination, Officer England confirmed that he did not uncover any evidence at the scene that related to the victim's cause of death.

Sergeant Michael Hill testified that he was working as a crime scene investigator with the MPD when he responded to process the scene at the vacant lot. He saw "a body of a male in like a grassy overgrown lot. He was dead. His pants was [sic] pulled down below his waist . . . [and] the victim had what appeared to be blood on his clothing." When he arrived at the scene, it was dark outside. Sergeant Hill identified several photographs that he took of the victim at the crime scene, and those photographs were entered into evidence without objection. He clarified that the vacant lot in question was located within a residential neighborhood surrounded by houses. Sergeant Hill did not find any shell casings or weapons at the scene.

On cross-examination, Sergeant Hill testified that he found two pills in the victim's pockets, although he could not identify what type of pills they were. He clarified that there was just "a little bit of blood" on the victim's body.

Detective Tim Helldorfer testified that he was working as a homicide investigator with the MPD when he was assigned as the lead investigator in the victim's death. By the time he arrived at the scene on March 3, 2006, it was "early daylight." He identified the victim in the pictures of the crime scene as Quentin Johnson. When he arrived at the scene, his initial impression was "that the body was dumped there, that it did not happen there." Detective Helldorfer "canvassed many blocks" in the area where the victim's body was found and interviewed several potential witnesses. Detective Helldorfer asked the Defendant to come to the police station because he was "a friend of the victim," and Detective Helldorfer interviewed him in order to gain some information about the victim. During that interview, the Defendant claimed that he and the victim had "parted ways earlier in the evening" and that he had no knowledge of the circumstances of the victim's death. Detective Helldorfer retired from the MPD in 2008, and the case was transferred to another investigator.

Alendraco Jones identified the Defendant as his uncle's cousin. On the evening of March 2, 2006, Jones was at his home at 1050 Shaw Place, where he lived with his mother and seven little sisters. Several people were visiting his house that night, including the Defendant, the victim, Calvin Mangrum, Robert Mickens, and two other men whose names

he did not know. That night, Jones and his sisters were asleep in the back room, while the house guests were all in the front living room "[k]icking it, partying." Jones testified that he went to sleep around 9:30 p.m. At some point during the night, he was awakened by the sound of a single gunshot. He was not sure what time he heard the gunshot, but he remembered that it was dark outside. After he heard the gunshot, Jones "went in the living room and saw [the Defendant] with the gun." He described the gun as "long" and "brown." He did not recall hearing anybody say anything while he was in the living room. After he saw the Defendant with the gun, Jones went back to his room and fell asleep.

About a month later, the Defendant approached Jones and asked him whether anybody had been talking about the victim's death. The Defendant warned Jones not to talk about the victim's death with anyone. Jones interpreted that conversation as a "[t]hreat" because the Defendant had a gun "on his hip" at the time. Jones felt that "if somebody did probably talk, [the Defendant] probably would have shot him." A couple of months later, the Defendant approached Jones again and asked him whether anybody had been "talking" or "spreading a rumor" about the victim's death. Jones also interpreted that conversation as a threat. He testified, "If I would have said yeah, he probably would have shot me." Jones identified a photo array in which he identified the Defendant's picture as being the person he saw with the gun, and it was entered into evidence without objection.

On cross-examination, Jones agreed that the Defendant "never pulled a gun" on him but that, rather, "[h]e just showed it."

Robert Mickens testified that he also attended the party. He and Calvin Mangrum had been friends for several years, and the house was owned by Calvin's[1] sister. He met the victim for the first time the night of the party. Mickens and the rest of the guests were "[s]itting having drinks, just talking, just hanging out." They all were drinking gin and smoking marijuana. At some point during the night, Calvin and the victim "got to arguing." According to Mickens, "They were arguing about [the victim] was being too loud and then they were arguing over the gin bottle." At the time Calvin and the victim were arguing, the Defendant was "[s]itting right on the love seat by the door . . . [p]robably about like two feet" away. Calvin and the victim "started pushing each other," and then the victim "grabbed the gin bottle and hit Calvin and Calvin grabbed it back and hit him." The bottle did not shatter during either strike.

As far as Mickens could see, neither Calvin nor the victim were bleeding after being hit with the bottle. Mickens stood up and put himself between the two, breaking up the fight. At that point, Mickens believed that the fight was over. He testified, "That's when I heard

_____

[1] Because he shares a surname with the Defendant, we will refer to Calvin Mangrum by his first name to avoid any confusion. We intend no disrespect.

-3-

the shot. . . . We all turned around. . . . I seen [the Defendant] with a long gun, look like a rifle." After the shot, the victim "said he been hit," and "he grabbed like towards his leg area." Mickens further testified, "[W]e all . . . looked at [the Defendant] like why? And then [the Defendant] took off running." Mickens then "took the kids up the street because they didn't need to be seeing that." When Mickens returned, Calvin told him that the victim's body had been moved. Mickens saw that the body had been moved across Shaw Place into the vacant lot across from the house. The Defendant and a man named Joshua, who also had been at the party, were the ones who moved the body. After the shooting, the Defendant said, "[B]etter not nobody say nothing and our life in the palm of his hand." Mickens called 911 and reported the shooting; however, he did not talk to the police when they arrived because he was "scared."

In March 2011, Mickens gave a statement to police regarding the victim's death. When asked why he had not spoken honestly with the police prior to that point, Mickens responded, "Because I was fearing for my life. . . . Because [the Defendant] said if I ever told somebody he was going to do harm to me and my family." A photo array on which Mickens identified the Defendant was entered into evidence without objection.

On cross-examination, Mickens denied that the Defendant seemed "sad," "scared," or "shaken up" immediately after shooting the victim. He agreed that the victim was still talking and breathing immediately after he was shot. Mickens admitted that he had lied about what actually occurred when he initially was questioned by police.

Calvin Mangrum, the Defendant's cousin, testified that he and the victim were close friends. He testified that he was also at the party the night the victim was shot. All of the adults were "drinking and listening to the radio and smoking some weed" in the living room while the children slept in the back room. At some point that evening, Calvin and the victim got into an "argument" that turned physical over his gin bottle. He testified, "I hit him, he hit me back. Then I hit him with the bottle and he hit me with the bottle. And [Mickens] kind of broke us up." The entire altercation lasted "probably like a minute." Calvin testified as to what happened after Mickens separated him and the victim:

> I heard a gunshot and [the victim] kind of stumbled and he said I been hit. . . . And after he said that, he kind of leaned toward the wall and staggered down a little bit, and me and [Mickens] helped him up and we noticed it was some blood on the wall in like a smear-type pattern from where he hit on the wall and where he was sliding down.

When he looked in the direction of the gunshot, Calvin saw the Defendant holding a long, brown rifle.

-4-

Calvin testified, "[W]e took [the victim] outside on the porch because he was like wheezing like he was trying to catch his breath." After Mickens called 911, the Defendant and Joshua carried the victim across the street because Calvin "didn't want the police coming in the house and taking [his] sister's kids." At the time the victim was taken across the street, he appeared "like he was trying to say something . . . but it just seemed like he was gasping for air."

When asked why he did not report the shooting to police, Calvin testified that he was "in fear" of the Defendant. When asked why he was afraid of the Defendant, Calvin stated, "Because, I mean, he [sic] gang affiliated and well known." At that point, defense counsel objected. The trial court overruled the objection. The trial court held a bench conference and explained that the objection was overruled because "it goes to the basis of why [Calvin] was afraid." However, the trial court stated that the State would not be allowed "a litany as to [the Defendant's] alleged activities or other affiliations." The trial court reasoned, "The fact that [Calvin] thinks [the Defendant is] a gang member, I think that was relevant to the limited extent . . . of why he says he was afraid." During the bench conference, defense counsel also objected to the anticipated testimony that Calvin was attacked by gang members affiliated with the Defendant. In regard to that testimony, the trial court ruled that Calvin would be permitted to testify "that he was in fact jumped" but not to a "link between the other attackers and [the Defendant]." Following that ruling, the direct examination resumed.

Calvin testified that, shortly after the shooting, the Defendant asked him whether he had talked to anybody about the shooting and warned him that there would be "consequences" if he did. In 2011, the police contacted Calvin regarding the shooting, and he gave a statement about what he had seen. About two weeks after he gave the statement, he was "attacked" on the street in his neighborhood. When he gave the statement to police, Calvin identified the Defendant in a photo array. The photo array was admitted into evidence at trial without objection.

On cross-examination, Calvin disagreed that the Defendant looked "upset" after the shooting but noted that he did have a "strange look on his face." Calvin testified that, after the shooting, the Defendant was pacing back and forth. When asked whether it appeared that the Defendant intended to kill the victim, Calvin responded, "I'm not sure about that. I mean, I don't think he had any intentions so, I mean, I wouldn't say yes."

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, was qualified as an expert in the field of forensic pathology. Dr. Chancellor identified the report of the victim's autopsy, and it was admitted into evidence without objection. According to Dr. Chancellor's expert opinion, the victim's cause of death was "a gunshot wound to the buttock." She explained that the bullet passed through the victim's pelvic bone and into his

"external iliac artery," which resulted in extensive internal bleeding. The victim died as a result of "bleeding out or hemorrhaging to death inside the body."

On cross-examination, Dr. Chancellor testified that the autopsy revealed that the victim's blood alcohol content was around .20 percent at the time of death. The victim also tested positive for cocaine.

Sergeant Robert Wilkie with the MPD testified that he was assigned to the investigation of the victim's death. The case remained unsolved until March 2011 when the MPD "received information that came from someone that said they had information on a homicide, that they knew who was the person responsible." Pursuant to that information, Sergeant Wilkie conducted several witness interviews, including those with Jones, Mickens, and Calvin, which ultimately led them to designate the Defendant as the prime suspect.

On April 27, 2011, the Defendant was brought to the police station for an interview. Sergeant Wilkie presented an advice of rights form to the Defendant, which the Defendant read aloud and signed indicating that he understood his rights. Sergeant Wilkie identified a transcribed statement of the Defendant signed by both Sergeant Wilkie and the Defendant, and the statement was entered into evidence without objection. In his statement to police, when asked whether he was the person responsible for the shooting death of the victim, the Defendant answered, "Yes." The Defendant stated that he shot the victim with a "brown and black, long" .22 caliber rifle. When asked to summarize what happened in his own words, the Defendant stated:

> We all at the house drinking and smoking weed, snorting a little powder. Calvin and [the victim] had an altercation about some money being stole, got to fighting with liquor bottle and beer bottles. Me and Calvin kept asking [the victim] to get out of the house. Told me no, he cussed me out and told me that he knows that I have [a] gun and to do what I had to do. Then I shot him in the butt. Then he looked around, looked around at everybody, dropped and was still breathing. Then that when everybody agreed to take him outside, Calvin and Robert Mickens and Josh took him to the field.

When asked whether there was anything he wanted to add to his statement, the Defendant responded, "I just was afraid at the time. I should have said something at first. I didn't expect that would happen with one shot to bottom."

Special Agent Eric Warren, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), was qualified as an expert in the field of forensic firearms examination. Special Agent Warren identified the bullet that was recovered from the

victim's body and submitted to him for analysis. As a result of his analysis, Special Agent Warren concluded that the bullet was a ".22 caliber long rifle" bullet.

At the conclusion of the State's proof, the defense moved for a judgment of acquittal, and the trial court denied the motion. The Defendant chose not to present any proof. The jury deliberated and found the Defendant guilty of the lesser-included offense of second degree murder. A sentencing hearing was held, and the trial court sentenced the Defendant to twenty-four years' incarceration. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal. In this direct appeal, the Defendant contends that the evidence was insufficient to support his convictions. He also asserts that the trial court erred in allowing Calvin to testify that the Defendant was gang affiliated and that he was attacked shortly after giving a statement to police.

## Analysis

### Sufficiency of Evidence

The Defendant asserts that the evidence was insufficient to support his conviction of second degree murder. Specifically, the Defendant asserts that "[a]t worst, this was a case of voluntary manslaughter," arguing that "the Defendant acted to defend [Calvin]," who was "savagely attack[ed]" by the victim. According to the Defendant, "At best, this was a case of defense of others, a version of self-defense."

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly,

-7-

the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

In Tennessee, second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2003). A murder is committed knowingly when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b); see also State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (holding that second degree murder is strictly a result-of-conduct offense). However, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing State v. Rutherford, 876 S.W.2d 118, 120-21 (Tenn. Crim. App. 1993)).

In the instant case, Mickens and Calvin both testified that the fight between Calvin and the victim was mutual and that each party hit the other with the gin bottle. Calvin testified, "I hit [the victim], he hit me back. Then I hit him with the bottle and he hit me with the bottle. And [Mickens] kind of broke us up." According to the testimony of both Mickens and Calvin, Mickens had broken up the fight and the fighting between Calvin and the victim had ceased at the time the Defendant shot the victim. Calvin, Mickens, and Jones each testified that they saw the Defendant with the rifle directly after the shooting. Furthermore, the Defendant's own statement in which he admitted to shooting the victim corroborated the testimony at trial. According to the Defendant's account, he and Calvin "kept asking [the victim] to get out of the house," but the victim refused to leave. The Defendant stated, "[The victim] cussed me out and told me that he knew that I have [a] gun and to do what I had to do." According to the Defendant's version of events, it was only after this challenge from the victim, well after the fighting had ceased, that the Defendant chose to shoot the victim.

The jury clearly discredited the Defendant's assertion that he shot the victim in order to defend Calvin from the victim's attacks. The evidence presented at trial showed that the Defendant shot the victim with a rifle at close range with little or no provocation, killing him. Therefore, the evidence was more than sufficient to lead a reasonable trier of fact to conclude that the Defendant knowingly engaged in conduct which he was aware was reasonably likely to cause the death of the victim. See Tenn. Code Ann. § 39-11-302(b). Accordingly, the Defendant is entitled to no relief on this issue.

*Objections to Testimony*

The Defendant next asserts that the trial court erred when it overruled his objections to Calvin's testimony that the Defendant was "gang affiliated" and that he was attacked after making a statement to police identifying the Defendant as the victim's shooter. The Defendant argues that the testimony was irrelevant under Rule 401 of the Tennessee Rules

of Evidence and that, even the if testimony were relevant, it should have been excluded under Rules 403 and 404(b) of the Tennessee Rule of Evidence.

The admissibility of evidence is a matter within the trial court's sound discretion, and we review such decisions under an abuse of discretion standard. State v. Hayes, 337 S.W.3d 235, 261 (Tenn. Crim. App. 2010); State v. Gomez, 367 S.W.3d 237, 243 (Tenn. 2012). Therefore, "[a] decision to admit evidence will be reversed 'only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning' and the admission of the evidence 'caused an injustice to the party complaining.'" Gomez, 367 S.W.3d at 243 (quoting State v. Gilliliand, 22 S.W.3d 266, 270 (Tenn. 2000)).

Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Finally, Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme." State v. Little, 402 S.W.3d 202, 210 (Tenn. 2013).

We hold that Calvin's testimony that he was attacked after giving a statement to police was not relevant under Rule 401. That is, the fact that Calvin was attacked by a group of unidentified individuals after he spoke with police does not have any tendency to make a fact of consequence in the instant case more or less probable. See Tenn. R. Evid. 401. We defer to the trial court's discretion in its conclusion that Calvin's testimony regarding the Defendant's gang affiliation[2] was relevant to explain Calvin's fear of the Defendant and the resulting gap in his willingness to speak to police regarding the incident. See Gomez, 367 S.W.3d at 243; see also State v. Johnson, 743 S.W.2d 154, 158 (Tenn. 1987) (holding that

---

[2] In its appellate brief, the State argues that "the record clearly reveals that the trial court sustained the Defendant's objection to that testimony and instructed the State and [Calvin] that he could not testify about gang affiliation." However, on careful review of the record before us, we note that the trial court overruled the Defendant's objection to Calvin's testimony that the Defendant was "gang affiliated," and, although the trial court instructed the State to tailor its future questioning to avoid any further reference to gang affiliation, Calvin's initial testimony remained in the evidence before the jury. Moreover, the trial court did not instruct the jury to disregard the testimony regarding gang affiliation.

a witness could testify as to the appellant's gang affiliation in order to "explain [the witness'] alleged fear of appellant and his reason for not reporting the homicide to the police for some time after it occurred"); State v. Deangelo M. Moody and Martez D. Mathews, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718, at *12 (Tenn. Crim. App. May 9, 2013) (upholding testimony regarding the defendant's gang affiliation "for the purpose of explaining why the witnesses were reluctant to cooperate"). However, we conclude that any probative value of the Defendant's gang affiliation was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. Calvin's belief regarding the Defendant's gang affiliation added little to the evidence because Calvin's fear of the Defendant already was well established through his testimony that the Defendant had threatened him. By contrast, there was significant risk that the jury could have treated the Defendant's apparent gang affiliation as character evidence, and no limiting curative instruction was offered by the trial court to remedy any such potential unfair prejudice. See Moody, 2013 WL 1932718, at *12 (upholding similar contested testimony in part because "[t]he trial court fashioned a jury instruction to remedy any unfair prejudice to appellants").[3]

Based on the above reasoning, we hold that both Calvin's testimony that the he was attacked after speaking with the police and his testimony that the Defendant was "gang affiliated" were admitted in error. However, we hold that such error was harmless as we cannot say based upon this record that the erroneously admitted testimony more probably than not affected the outcome of the trial in light of the overwhelming evidence against the Defendant presented at trial as previously discussed herein. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Therefore, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, SP. JUDGE

---

[3] We also note that this Court previously has held that evidence of gang affiliation is character evidence subject to Rule 404(b). See, e.g., State v. Robert Edward Fritts, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *15 (Tenn. Crim. App. Feb. 20, 2014); State v. Ronald Eugene Brewer, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *16 (Tenn. Crim. App. Jul. 14, 2011), perm. app. denied (Sept. 21, 2011). Thus, in order to properly admit such testimony, the trial court should have complied with the procedural requirements of Rule 404(b).